**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARNETTA WOODSON, obo E.W., | ) ) ) | CASE NO.  1:11-cv-1992 |
| Plaintiff, | ) ) | MAGISTRATE JUDGE VECCHIARELLI |
| v. | ) ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | **MEMORANDUM OPINION AND ORDER** |

Plaintiff, Charnetta Woodson ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying the application of Plaintiff's daughter, E.W. ("the claimant"), for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et

seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case

is before the undersigned United States Magistrate Judge pursuant to the consent of

the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On July 1, 2008, an application for SSI was filed on behalf of the claimant.  (Tr. 32.)  The application was denied initially and upon reconsideration, so a request was filed for a hearing before an administrative law judge ("ALJ").  (Tr. 32.)  An ALJ held the claimant's hearing by video conference on June 17, 2010.  (Tr. 32.)  The claimant participated in the hearing, was represented by counsel, and testified.  (Tr. 32.)  On August 18, 2010, the ALJ found the claimant not disabled.  (Tr. 42.)  On July 19, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On September 22, 2011, Plaintiff filed a complaint on behalf of the claimant to challenge the Commissioner's final decision.  (Doc. No. 1.)  On January 24, 2012, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On March 23, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 16.)  On April 3, 2012, Plaintiff filed a Reply Brief.  (Doc. No. 17.)

Plaintiff asserts three assignments of error:  (1) the ALJ failed to address the claimant's diagnoses of post traumatic stress disorder ("PTSD"), depression, anxiety, enuresis, and encopresis and deem them severe impairments; (2) the ALJ failed to give appropriate weight to the opinions of consultative examiner Dr. Koricke; and (3) the ALJ's findings that the claimant had less than marked limitations in the domains of attending to and completing tasks and caring for herself are not supported by substantial evidence.

## II.    EVIDENCE

2

### A.    Personal and Vocational Evidence

The claimant was a school-age child at all times relevant to the disposition of her application for disability benefits, with no past relevant work activity.  (*See* Tr. 35.)

### B.    Medical Evidence

On September 13, 2007, Plaintiff presented with the claimant to Ms. Calley Krivosh, a license social worker, at Applewood Centers.  (Tr. 304-14.)  Ms. Krivosh indicated that Plaintiff reported the following about the claimant.  Plaintiff brought the claimant to Applewood in relation to the claimant's behavior and possible past sexual abuse.  (Tr. 304.)  The claimant's brother recently admitted to inappropriate sexual behavior toward the claimant.[1]  (Tr. 312.)  The claimant was impulsive, inattentive, disruptive, dishonest, "sneaky," shy and timid at times and then talkative at inappropriate times, and forgetful.  (Tr. 304.)  The claimant engaged in physical fights, argued and used inappropriate language, was eneuretic and encopretic, constantly scratched her arms, and had difficulty completing her homework.  (Tr. 304.)

The claimant was enrolled in regular classes in school.  (Tr. 307.)  She obtained A's, B's, and C's; and she was an honor roll and merit roll student.  (Tr. 307.)  Her attendance was not a problem; and there was no indication that she had been required to repeat any grades.  (Tr. 307.)  The claimant had, however, been suspended from daycare for fighting.  (Tr. 307.)

Ms. Krivosh diagnosed the claimant with an inattentive type of Attention Deficit Hyperactivity Disorder ("ADHD") and an Adjustment Disorder with a mixed disturbance

---

[1]  Ms. Krivosh noted that "it is unclear at this time exactly what occurred."  (Tr. 313.)

3

of emotions and conduct.  (Tr. 313.)  Dr. Krivosh indicated that stressors included the claimant's parents' separation, witnessing past domestic violence, and alleged sexual abuse.  (Tr. 313.)  Dr. Krivosh assigned the claimant a Global Assessment of Functioning ("GAF") score of 55[2] and referred the claimant for a psychiatric assessment to address her ADHD symptoms.  (Tr. 313.)

On November 7, 2007, the claimant underwent a psychiatric evaluation with Dr. Frok, M.D., at Applewood.[3]  (Tr. 315-19.)  Dr. Frok indicated that Plaintiff reported the following about the claimant.  The claimant was failing school because, according the her teachers, she did not pay attention.  (Tr. 315.)  Two weeks prior, the claimant's 14-year-old brother reported that he had sexually molested the claimant two years ago while the claimant was sleeping; however, the claimant did not remember.  (Tr. 315.)  The claimant's brother had been removed from the home, and Child and Family Services had an open case with the claimant's family.  (Tr. 315.)

The claimant was doing well until two years prior, after her brother was removed from the home.  (Tr. 315.)  The claimant had become more aggressive and was almost "kicked out" of daycare.  (Tr. 315.)  Plaintiff and her husband were separated, and the claimant and her siblings did not handle it well.  (Tr. 315.)  The claimant's family had been attending therapy sessions for the past three weeks in relation to the alleged

---

[2]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[3]  The record does not clearly indicate Dr. Frok's first name.  (See Tr. 319.)

4

sexual abuse.  (Tr. 315.)

Upon mental examination, Dr. Frok indicated that the claimant presented well-groomed with average demeanor, eye contact, activity, and speech.  (Tr. 316.)  Dr. Frok reported that the claimant's thought processes were logical; her behavior was cooperative; her mood was euthymic;[4] her intelligence was average; and her insight and judgment were fair.  (Tr. 317.)  In sum, Dr. Frok noted that the claimant was "spontaneous" and "pleasant."  (Tr. 317.)

Dr. Frok indicated that the claimant admitted her brother had been "on top of [her]" while she was clothed and that she did not want it to happen again; and that her siblings did not want to talk about it because they wanted their brother to return home. (Tr. 316.)

Dr. Frok diagnosed the claimant with PTSD, ADHD, enuresis, and encopresis. (Tr. 318.)  He assigned her a GAF score of 45[5] and prescribed Adderall XR.  (Tr. 318.) He commented that he would give Plaintiff "Prozac for PTSD symptoms and target aggression and skin picking one week from starting Adderall XR."  (Tr. 318.)

On October 1, 2008, state agency reviewing psychologist Irma Johnston, Psy.D., completed a Childhood Disability Evaluation Form upon initial consideration of the

---

[4] Euthymia is "a state of mental tranquility and well-being," and "neither depressed nor manic."  Dorland's Illustrated Medical Dictionary 572 (30th ed. 2003).

[5] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 2, at 34.

claimant's application for disability benefits and indicated the following.  (Tr. 273-78.)

The claimant suffered PTSD, ADHD, and enuresis.  (Tr. 273.)  She had no limitations in

acquiring and using information, and moving about and manipulating objects; less than

marked limitations in attending to and completing tasks, caring for herself, and in her

health and physical well-being; and marked limitations in interacting and relating with

others.  (Tr. 275-76.)  Dr. Johnston indicated that the claimant had less than marked

limitations in attending to and completing tasks because the evidence showed the

claimant did not miss school frequently; helped with household chores; was able to

finish tasks; performed satisfactorily in school in 7 out of 12 classes; and took Adderall

for her ADHD.  (Tr. 275.)  Dr. Johnston found the claimant less than markedly limited in

caring for herself despite noting Plaintiff's reports that the claimant suffered enuresis

and encopresis.  (Tr. 276.)

On July 30, 2008, the claimant returned to Applewood Centers for a follow-up.

(Tr. 321.)  A nurse[6] attended to the claimant indicated the following.  The claimant was

"[d]oing well overall."  (Tr. 321.)  She took medication without side effects, and she was

"getting along ok with [her] siblings."  (Tr. 321.)  The claimant's father, however,

believed the claimant needed to continue her therapy and talk more about her problems

and worries.  (Tr. 321.)

On January 21, 2009, the claimant underwent a consultative psychological

evaluation with clinical psychologist Deborah A. Koricke, Ph.D.  (Tr. 365.)  Dr. Korocke

---

[6] The record does not clearly indicate the nurse's name and credentials.
However, the nurse's assessment was affirmed by Dr. P. Lachhwani, M.D.  (Tr.
321.)

indicated that Plaintiff reported the following about the claimant.  The claimant awoke during the night with nightmares; and she wet herself both day and night.  (Tr. 369.) Plaintiff routinely needed to tell the claimant to change her clothes and do her homework.  (Tr. 369.)  The claimant did chores such as cleaning her room, taking out the trash, and sweeping the floor, but she sometimes forgot to do so and needed to be reminded.  (Tr. 369.)

Upon mental examination, Dr. Koricke indicated the following.  There was "evidence of severe scarring on [the claimant's] right arm from constant picking at her skin."  (Tr. 367.)  The claimant appeared anxious during the examination, and "the scaring on her arm demonstrates the intensity of [her] anxiety."  (Tr. 368.)

Dr. Koricke diagnosed the claimant with ADHD, PTSD, and enuresis, and assigned the claimant a GAF score of 45.  (Tr. 369.)  She also diagnosed the claimant with encopresis, but in remission, as the claimant's mother reported there were no problems for the last two months.  (Tr. 369.)  Dr. Koricke concluded that Plaintiff was markedly impaired in her social development, personal and behavioral development, and concentration and persistence.  (Tr. 370.)

On February 18, 2009, state agency reviewing psychologist Tonnie Hoyle, Psy.D., completed a Childhood Disability Evaluation Form upon reconsideration of the claimant's application for disability benefits and indicated the following.  (Tr. 285-90.) The claimant suffered PTSD, ADHD, and enuresis.  (Tr. 285.)  She had no limitations in moving about and manipulating objects, as well as in her health and physical well-being; less than marked limitations in acquiring and using information, attending to and completing tasks, and caring for herself; and marked limitations in interacting and

7

relating with others.  (Tr. 287-88.)

Dr. Hoyle indicated that the claimant had less than marked limitations in attending to and completing tasks for the following reasons.  The claimant rushed through class work, "often put[] down any answer to get [school] assignment[s] completed," rarely asked for help, and had "obvious problems transitioning between activities and working without distracting others"; however, she was taking Adderall and Tenex for her ADHD, her mother reported "some improvement" in her ADHD symptoms since her Tenex was increased, and she regularly attended school, helped with basic household chores, and finished tasks.  (Tr. 287.)  Dr. Hoyle indicated that the claimant had less than marked limitations in caring for herself for the following reasons.  The claimant's mother reported the claimant continued to suffer enuresis and suffered sexual abuse, the claimant's teachers reported she had difficulty expressing her frustrations, and anxiety caused the claimant to pick at her skin; however, the claimant's teachers did not report that the claimant suffered enuresis, and a rape kit dated July 2007 was negative for penetration.  (Tr. 288.)

On May 13, 2010, the claimant presented to Appelwood for a follow-up.  (Tr. 392.)  The nurse[7] who attended to the claimant indicated the following about the claimant.  The claimant had been taking her medication without side effects.  (Tr. 392.)  Her appetite and sleep were "ok"; and she had been doing "ok" in school, as there were "no calls about her behavior."  (Tr. 392.)  However, she had "begun bedwetting again."

---

[7] The record does not clearly indicate the nurse's name and credentials.  However, the nurse's evaluation appears to have been affirmed by Dr. Frok.  (*See* Tr. 392.)

(Tr. 392.)

On April 14, 2010, the claimant presented to Dr. Frok for a follow-up.  (Tr. 393-95.)  Dr. Frok indicated the following.  The claimant was "doing well."  (Tr. 393.)  She was taking her medication every day without problems, and eating and sleeping well. (Tr. 393.)  However, she continued to have "some problems with disrupting the class" at school by talking out of turn and loudly, and "talking back."  (Tr. 393.)  Plaintiff reported that the claimant had been playing very rough with her dolls; would take off the clothing on her dolls and make them fight; and would call the dolls "B--ches" and position them such that one would lie on top of another.  (Tr. 393.)  Plaintiff believed that the claimant's anxiety had worsened.  (Tr. 393.)

### C.    Reports from the Claimant's School

In the second grade of primary school (the 2006 through 2007 school year), the claimant's grades fluctuated among A's, B's, and C's.  (Tr. 362.)  Although she received an F in mathematics in the first quarter, she received a B by the fourth quarter.  (Tr. 362.)  The claimant performed less well in the third grade, as she received several D's as well as an F throughout the school year.  (*See* Tr. 363.)  In the first quarter of the fourth grade, the claimant received mostly C's and D's.  (Tr. 186.)

School bus "conduct reports" from 2005 and 2006 indicate that the claimant often was disobedient; for example, the claimant would climb over seats while the bus was moving, would not put on her seatbelt, and would engage in "horseplay" that included hitting others.  (*See* Tr. 154-61.)  Numerous incident reports from school or from summer day camp between 2006 and 2008 indicate that the claimant was

9

disobedient or disruptive.  (*See* Tr. 196, 197, 198, 201, 204, 209, 210, 268.)  The claimant also was "written up" for fighting with her brother (Tr. 262, 263), hitting or pushing other students (Tr. 190, 196, 203, 211, 265, 269), and breaking other students' property (Tr. 267).  At summer camp in 2007, the camp staff informed the claimant's parents that they would not take the claimant on a scheduled field trip because she would not follow directions (Tr. 200, 266); and the claimant was suspended on two occasions for hitting or fighting (Tr. 208, 211).  On May 29, 2008, the claimant was suspended from school for being disruptive in class by "yelling out" and failing to focus on lessons.  (Tr. 192-93.)

On January 4, 2008, the claimant's teacher, Ms. Jeannine Pilch, completed a Teacher Questionnaire and indicated the following.  (Tr. 164-71.)  She had known the claimant for three months and saw the claimant five days a week for 6 and a half hours a day.  (Tr. 165.)  Regarding caring for herself, the claimant had a "very serious problem" with knowing when to ask for help; an "obvious problem" with handling frustration appropriately and responding appropriately to changes in her mood; a "slight problem" with being patient when necessary and using appropriate coping skills to meet daily demands of school; and "no problem" in taking care of personal hygiene and physical needs such as dressing and eating, cooperating in or being responsible for taking needed medication, using good judgment regarding personal safety and dangerous circumstances, and identifying and appropriately asserting emotional needs.  (Tr. 169.)  Ms. Pilch explained that the claimant "does not ask for help when she does not understand an assignment" but "just puts down any answer."  (Tr. 169.)

Regarding attending to and completing tasks, Ms. Pilch indicated that the

10

claimant had a "very serious problem with completing work accurately without careless mistakes; an "obvious problem" with changing from one activity to another without being disruptive, working without distracting herself or others, and working at a reasonable pace and finishing tasks on time; a "slight problem" with focusing long enough to finish assigned activities or tasks, refocusing on tasks when necessary, carrying out multi-step instructions, waiting to take turns, and completing classroom and homework assignments; and "no problem" with paying attention when spoken to directly, sustaining attention during play/sports activities, carrying out single-step instructions, organizing her own things or school materials, and completing classroom and homework assignments.  (Tr. 170.)  Ms. Pilch explained that the claimant "completes her assignments on time but there are often many errors because she 'rushes' to get it done."  (Tr. 170.)

On January 7, 2008, Ms. Pilch authored a School Activities Questionnaire and indicated the following.  (Tr. 172-73.)  Although the claimant was in regular fourth grade classes, she was not performing at a fourth grade level.  (Tr. 172.)  The claimant had a short attention span but had an average ability to follow instructions; performed "average" in reading but "below average" in writing and mathematics; exhibited age-appropriate hygiene and self care; and had good attendance and was not late for school.  (Tr. 172-73.)  However, she scratched and pushed other students "for no reason."  (Tr. 173.)

### D.    Plaintiff's Reports of the Claimant's Condition

On July 18, 2008, Plaintiff completed a Function Report regarding the claimant and indicated, in relevant part, the following.  (Tr. 175-85.)  The claimant was "limited" in

11

her ability to pay attention and "stick with a task," as she did not finish things she started or compete her homework.  (Tr. 185.)  Plaintiff was "not sure" whether the claimant's impairments affected her ability to take care of personal needs, as the claimant was able to perform most self care activities except wash her hair by herself and accept criticism or correction.  (Tr. 184.)

On September 16, 2008, Plaintiff completed another Function Report and indicated the following.  (Tr. 213-17.)  The claimant awoke "wet" every morning, and she "picks at her skin and continues to make the scar bigger."  (Tr. 213.)  She also "acted out" with yelling and anger, and she fought with her twin brother.  (Tr. 214.)  She was suspended from school for disrespecting students and teachers.  (Tr. 215.)  However, she attended a new school and there were not yet any reports of problems.  (Tr. 215.)  At home, she swept the floors and cleaned her room once or twice a week, and she performed these chores "ok/good," although she would leave the trash from her room outside her room until Plaintiff said something about it.  (Tr. 213.)  She required moderate supervision because she was a victim of sexual abuse and she picked at her skin.  (Tr. 213.)  She played "ok" with her family members and friends.  (Tr. 213.)  But she would not listen to directions or commands; for example, in stores she would run around and knock things down.  (Tr. 215.)

### E.    Hearing Testimony

Plaintiff testified regarding the claimant at the claimant's hearing as follows.  The claimant was in fifth grade and was enrolled in regular classes.  (Tr. 9.)  She also obtained tutoring at school and at Sylvan Learning Center.  (Tr. 10.)  She would be removed from class when there was classroom work because she was disruptive, and

she was given extra time to complete her classroom work.  (Tr. 10.)  She was suspended a few times because of her behavior, the last occasion being two weeks prior.  (Tr. 10-11.)  The claimant mostly played by herself; had imaginary friends; and talked to herself.  (Tr. 14.)  She enjoyed being helpful to Plaintiff, such as by helping her fold clothes.  (Tr. 14.)

Regarding personal hygiene, Plaintiff had to help the claimant because the clamant would not brush her teeth and use deodorant.  (Tr. 13.)  The claimant could wash herself, but she did not wash thoroughly.  (Tr. 13.)  She had a habit of picking at the skin on her arm, which caused the location to bleed and scar.  (Tr. 15.)  She continued to wet her bed at night (Tr. 12); and on three of four occasions she suffered encopresis at school and Plaintiff had to bring her fresh clothes (Tr. 15).

The claimant was the victim of sexual abuse by her brother and suffered PTSD because of it.  (Tr. 12, 17.)  The claimant's attorney admitted there were no detailed accounts of the sexual abuse in the record.  (Tr. 16.)  The ALJ observed that Dr. Frok indicated the claimant admitted she remembered her brother on top of her while she was clothed.  (Tr. 17.)  Plaintiff explained that she understood the claimant had been asleep and the claimant's brother had awakened her; and Plaintiff reported that the claimant's brother said he had penetrated the claimant.  (Tr. 17.)  Plaintiff was not sure if the claimant suffered flashbacks of the abuse because the claimant appeared not to remember the event.  (Tr. 13.)

The claimant had undergone one-on-one counseling at Applewood with Ms. Calley Krivosh in relation to the alleged sexual abuse and PTSD; however, the claimant's attorney conceded that documentation of those therapy sessions was not in

13

the record and that she had not been able to obtain them.  (Tr. 20-22.)  The ALJ

instructed Plaintiff to obtain and submit the records of the claimant's therapy sessions.

(Tr. 24.)

### III.  STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if she has a

medically determinable physical or mental impairment which results in marked and

severe functional limitations, and which can be expected to result in death, or which has

lasted, or can be expected to last for a continuous period of not less than 12 months.

*See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F.

App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for

determining whether a child-claimant is disabled.  First, the Commissioner must

determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not

engaged in substantial gainful activity, the Commissioner must determine whether the

child suffers impairments or a combination of impairments that are "severe" and that are

expected to result in death or have lasted or are expected to last for a continuous

period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*,

37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of

impairments that meet the Act's durational requirement, the Commissioner must

determine whether they meet, medically equal, or functionally equal an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or

combination of impairments meets, medically equals, or functionally equals[8] an

impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant was . . . a school-age child on July 1, 2008, the date the application was filed, and is currently a school-age child.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3.    The claimant has the following severe impairment:  Attention Deficit Hyperactivity Disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The claimant does not have an impairment or combination of impairments that functionally equals the listings.

The claimant has less than marked limitation in acquiring and using information.

The claimant has less than marked limitation in attending [to] and completing tasks.

The claimant has marked limitation in interacting and relating with

---

[8] To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).

others.

The claimant has no limitation in moving about and manipulating objects.

The claimant has less than marked limitation in the ability to care for herself.

The claimant has no limitation in health and physical well-being.

6.    The claimant has not been disabled, as defined in the Social Security Act, since July 1, 2008, the date the application was filed.

(Tr. 35-42.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ. *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

16

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

**B.**     **The ALJ's Assessment of Severe Impairments**

Plaintiff contends that the ALJ erroneously failed to address the claimant's diagnoses of PTSD, depression, anxiety, enuresis, and encopresis and deem them severe impairments at step two of his analysis.  For the following reasons, this assignment of error is not well taken.

Plaintiff does not cite any evidence that the claimant was diagnosed with anxiety and depression; accordingly, there is no basis to conclude that the ALJ should have addressed those diagnoses.  Plaintiff only cites evidence that the claimant was diagnosed with PTSD, enuresis, and encopresis; however, mere diagnoses say nothing about the extent to which a claimant is limited.  *See, e.g., Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits.  Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").

17

Nevertheless, the ALJ addressed Plaintiff's diagnoses of PTSD, enuresis, and encopresis:  the ALJ explained that Plaintiff's PTSD and enuresis did not qualify as medically determinable severe impairments because they were based primarily on the claimant's mother's reports and not on independent observations in the objective medical evidence (Tr. 35, 37); and the ALJ observed that the claimant's mother's reports of enuresis and encopresis were not supported by the claimant's school records (Tr. 36, 37, 42).

Further, as explained below, Plaintiff has failed to show that any error in failing to find the claimant suffered severe PTSD, enuresis, and encopresis at step two would have been harmful and would have warranted remand.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  All of a

18

claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, the ALJ found Plaintiff suffered severe ADHD; accordingly, Plaintiff cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.  Moreover, the ALJ considered the claimant's PTSD, enuresis, and encopresis throughout the rest of his opinion.  Plaintiff has provided no basis to conclude that any failure to find the claimant's diagnoses of PTSD, enuresis, and encopresis were severe at step two was harmful.[9]  Accordingly, for the foregoing reasons, this assignment of error is not well taken.

### C.      The ALJ's Assessment of Dr. Koricke's Opinions and the Claimant's Domains of Functioning

Plaintiff contends that Dr. Koricke's opinions that the claimant suffered PTSD and was markedly impaired in her social development, personal and behavioral development, and concentration and persistence support the conclusion that the claimant functionally met the Listings and was, therefore, disabled.  That is, Plaintiff

---

[9] Plaintiff states in a cursory manner that, "[i]n choosing to reject these diagnoses as severe impairments, the ALJ disregarded the opinions from two credible sources, treating and consulting, whose shared opinions were supported by the record," and "[o]nce the ALJ rejected these impairments as non-severe, he further erred by failing to consider these impairments under the Listings and failing to consider any resulting limitations in assessing [the claimant's] functional equivalence in each of the six domains."  (Pl.'s Br. 12.) Plaintiff provides no further explanation of these assertions and no citation to legal authority in support; accordingly, to the extent these assertions constitute arguments, they are waived.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

19

contends this evidence shows the claimant was markedly impaired in her functional domains of attending to and completing tasks[10] and caring for herself.[11]  Plaintiff continues that the ALJ improperly gave little weight to Dr. Koricke's opinions and instead relied on the opinions of Dr. Hoyle to find that the claimant was less than markedly impaired in her domains of attending to and completing tasks and caring for herself.  Plaintiff concludes that substantial evidence does not support the ALJ's determination that the claimant was less than markedly limited in those domains, but supports the conclusion that the claimant is disabled.  For the following reasons, these assignments of error are not well taken.

The ALJ assessed Dr. Koricke's opinions as follows:

> Dr. Koricke's diagnosis of post traumatic stress syndrome appears based on the mother's report that the claimant was sexually abused, which is unsupported in the record . . . .  Her functional conclusions were based on the mother's self-report[s], which are not fully supported by the evidence.  The teacher and school reports do not reflect the same level of severity alleged.

(Tr. 37.)  Plaintiff argues that "[t]he ALJ had no basis to reject the allegation of sexual abuse," and "committed reversible error when he rejected the claimant's sexual abuse[] and used that as a basis to reject the credible opinion of . . . Dr. Koricke."  (Pl.'s Br. 14.)

---

[10]  The domain of attending to and completing tasks concerns how well a child is able to focus and maintain her attention, and how well she begins, carries through, and finishes her activities, including the pace at which she performs activities and the ease with which she changes them.  *See* 20 C.F.R. 416.926a(h).

[11]  The domain of caring for oneself concerns how well a child maintains a healthy emotional and physical state, including how well she gets her physical and emotional wants and needs met in appropriate ways; how well she copes with stress and changes in her environment; and whether she takes care of her own health, possessions, and living area.  *See* 20 C.F.R. 416.926a(k).

The ALJ did not, however, *reject* Plaintiff's allegation that the claimant was sexually abused; rather, he found the allegation unsupported by the record and, therefore, an inadequate basis upon which to conclude the claimant suffered PTSD.  The ALJ explained that although Plaintiff alleged her son admitted to sexually abusing the claimant, the evidence showed that the claimant did not remember the event,[12] her brother had not been criminally charged, a rape kit found no evidence of penetration,[13] and no records of the claimant's weekly counseling sessions were in the record.  (Tr. 36, 42.)  Indeed, the claimant's attorney conceded during the claimant's hearing that there was no detailed evidence of the sexual abuse in the record.[14]  The ALJ reasonably concluded that there was insufficient evidence that the claimant suffered PTSD caused by sexual abuse because there was insufficient evidence of the sexual abuse.  Further, even if the ALJ erred in rejecting Dr. Koricke's diagnosis of PTSD, such an error would be harmless, as a mere diagnosis says nothing about the extent to which a claimant is limited.  *See Foster*, 853 F.2d at 489; *Higgs*, 880 F.2d at 863.

The proper inquiry is whether the ALJ's findings that the claimant was less than markedly limited in the domains of attending to and completing tasks and caring for herself are supported by substantial evidence.  The ALJ found the claimant less than

---

[12]  The ALJ appears to have overlooked Dr. Frok's report that the claimant admitted her brother had been "on top of" her while she was clothed; that she wished he would not do it again; and that she and her siblings refrained from talking about the sexual abuse because they wanted their brother to return home.  (*See* Tr. 316.)

[13]  Plaintiff alleged that her son said he had penetrated the claimant.  (Tr. 17.)

[14]  The ALJ instructed Plaintiff to obtain and submit the records of Plaintiff's therapy session, and Plaintiff appears to have failed to do so.

markedly limited in those domains for the following reasons.  Despite the claimant's
teacher's reports that the claimant rushed through classroom work and put down any
answer to complete the work, rarely asked for help, and had difficulty transitioning
between activities, the ALJ found the claimant less than markedly limited in attending to
and completing tasks because she was prescribed medication for her ADHD, her
mother reported that her ADHD symptoms had improved, she attended school
regularly, she helped with household chores, and she was able to finish tasks.  (Tr. 39.)
The ALJ found the claimant less than markedly limited in caring for herself because,
despite her limitations, her school records did not corroborate her mother's allegations
of enuresis, and her mother's allegation of sexual abuse was unsupported by the
evidence.  (Tr. 41.)

The ALJ's findings essentially mimic those of Dr. Hoyle.  The opinions of a state
agency reviewing psychologist constitute expert medical opinion evidence and may
constitute substantial evidence when they are supported by the record.  *See* S.S.R. 96-
6P, 1996 WL 374180, at *1 (S.S.A.); *Senters v. Sec'y of Health & Human Servs.*, 960
F.2d 150 (Table), 1992 WL 78102, at *3 (6th Cir. Apr. 17, 1992) (citing *Loy v. Sec'y of
Health & Human Servs.*, 901 F.2d 1306, 1308-09 (6th Cir. 1990) (per curiam)). The ALJ
explained that he gave Dr. Hoyle's opinions significant weight because they were
consistent with the claimant's medical and educational record as a whole.  (Tr. 37.)

Plaintiff contends that the ALJ improperly gave greater weight to Dr. Hoyle's
opinions than Dr. Koricke's opinions because Dr. Hoyle, as a reviewing psychologist,
did not examine the claimant as Dr. Koricke did.  As an initial matter, Plaintiff does not

explain how Dr. Koricke's opinions support the conclusion that the claimant was markedly impaired in the domains of attending to and completing tasks and caring for herself.  Indeed, Dr. Koricke's opinions that the claimant was markedly impaired in her social development and personal and behavioral development appear to bear on the claimant's domain of interacting and relating with others (in which the ALJ found the claimant markedly impaired).

Further, ALJs are not required to give weight to medical source opinions if those opinions are not supported by the record.  *See* 20 C.F.R. 404.1527(c)(3).  Here, the ALJ found that Dr. Koricke's opinions were unsupported by the record because they were based primarily on the claimant's mother's reports, which were unsupported by the objective medical evidence, and they were inconsistent with the claimant's school records.  (Tr. 37.)  These findings were not unreasonable.

Finally, Plaintiff contends that substantial evidence shows the claimant was markedly impaired in the domains of attending to and completing tasks and caring for herself, and that the ALJ overlooked that evidence.  Plaintiff specifically contends that the ALJ failed to account for the evidence that the claimant picked at her arm and caused bleeding and scarring, and that the claimant had anger problems that included hitting others.  But Dr. Hoyle's opinions, upon which the ALJ relied, accounted for the claimant's habit of picking at her arm (*see* Tr. 288); and the ALJ accounted for the claimant's anger problems in his finding that the claimant was markedly impaired in interacting and relating with others (*see* Tr. 39-40).

The ALJ also based his decision on the claimant's school records and the credibility of Plaintiff's allegations (with which Plaintiff has not taken issue).  The

23

claimant clearly suffers limitations from her impairments.  Nevertheless, the ALJ's determination that the claimant's limitations are not disabling under the Social Security Act is supported by substantial evidence.  Accordingly, Plaintiff's assignments of error are not well taken.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  June 15, 2012

24